# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 28, 2010

## STATE OF TENNESSEE v. JOHN E. LANE

**Direct Appeal from the Circuit Court for Grainger County**
**Nos. 4347, 4436      O. Duane Slone, Judge**

---

**No. E2009-02225-CCA-R3-CD - Filed May 24, 2011**

---

A Grainger County Circuit Court Jury convicted the appellant, John E. Lane, of the premeditated first degree murder of Joe Brooks and conspiracy to commit first degree murder. The trial court imposed a total effective sentence of life in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence underlying his convictions. Upon review, we affirm the appellant's conviction for first degree murder but reverse his conviction for conspiracy.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part, Reversed in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

James L. Deaton, Dandridge, Tennessee, for the appellant, John E. Lane.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; James B. Dunn, District Attorney General; and Tonya Keith, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, the State's witness, Cindy Woody, testified that on January 25, 2007, she was at the residence of her boyfriend, the victim, Joe Brooks. She stated that Mark Hill was the owner of the victim's residence. She said that the victim was "medium height, kind of husky," and walked with a cane. Woody said the victim moved slowly, had a lot of medical problems, and had been prescribed morphine and oxycodone for pain. That morning, she

took the victim to the doctor, and he was given braces to wear on his feet.

Woody stated that about fifteen minutes after they returned to the victim's residence, the appellant and his brother, Kenny Lane,[1] stopped by. When she answered the door, they said hello and came inside. Woody said they did not appear surprised to see her or the victim. In fact, she noted that she had seen the appellant approximately six weeks earlier at Sue Jarnigan's residence. After Woody let them in the victim's residence, the appellant and Kenny Lane sat in the living room with the victim while Woody went into the kitchen to make coffee.

Woody heard the men talking but could not understand what they were saying. When the talking got louder, Woody went to the edge of the kitchen to see what was happening. She saw the appellant stand and pull a gun out of his jacket pocket. The appellant told the victim, "You will never talk about me again," then fired the gun. Woody did not see the shot hit the victim because the appellant was blocking her view. She said the shooting occurred around 1:30 p.m.

Woody said she started crying, and Kenny Lane told her "to be still and shut up." Woody said that "[a]s [Kenny Lane and the appellant] went out the door slowly, just casually, [the appellant] turned back around to me and said, 'Now you can go check and see if he's dead.'" After they left, Woody locked the door, called 911, and ran to the victim, who was lying on the floor in front of the bedroom. He asked her to remove the braces and shoes from his feet. The victim was conscious and talking when he was taken away by ambulance.

Woody stated that she did not see a gun anywhere near the victim when he was lying on the floor. She said that the victim did not carry a handgun but that he had a shotgun in his bedroom. She said that although the victim took prescription pain killers, he did not take drugs that day and was not an intravenous drug user. She stated that she did not hide any drugs or guns after the shooting in order to protect the victim's reputation.

Tennessee Bureau of Investigation (TBI) Agent Brian Fraley testified that the victim was taken to Holston Valley Hospital in Kingsport where he died later that day.

Deputy Jamie Winstead with the Grainger County Sheriff's Department testified that at 1:47 p.m. on January 25, 2007, he was dispatched to the victim's residence. When he arrived and went inside the residence, he saw the victim lying on the floor near the doorway to the bedroom. Deputy Winstead said the victim was awake and holding his chest. The

---

[1] Some of the individuals in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

victim said that he had been shot by the appellant. Deputy Winstead said he did not see any weapons near the victim, but he acknowledged that he did not search the house for weapons.

Deputy Jesse Jarnigan testified that when he went to the victim's residence after the shooting, the victim was lying on his back on the floor. He asked the victim who shot him, and the victim responded that the appellant did. Deputy Jarnigan searched the house for weapons. He stated that a gun rack containing shotguns or rifles was hanging on the living room wall. Additionally, a long gun, either a shotgun or rifle, was in the bedroom. Deputy Jarnigan recalled that when the appellant was taken to the jail for booking, he emptied his pockets onto the counter. Among the contents were four .38 caliber bullets.

Sheriff James Harville testified that when he searched the victim's residence after the shooting, he found a spent .38 caliber bullet on the floor in the corner of the bedroom. He also saw either a shotgun or a rifle in the bedroom. The bullet was tested, and the results revealed that the bullet came from the appellant's gun, a Derringer, which held a maximum of two bullets.

The parties stipulated to the entry of the autopsy report. The report reflected that the victim was a forty-six-year-old white male, who was 5'4" tall and weighed 236 pounds. The victim died as a result of "a perforating gunshot wound of the torso." The bullet entered the victim's right upper back near the midline. The bullet's trajectory was from back to front, left to right, and slightly downward. The bullet passed through the victim's right lung and liver before exiting the chest near the right nipple. The report reflected that the victim's body bore evidence of intravenous drug use, such as scabs on the arms. After the stipulation, the State rested its case-in-chief.

The appellant testified that he was forty-four years old and had known the victim about thirty years. The appellant said that at the time of the offense, he was living "place to place" and carried a two-shot Derringer for protection.

He said that on January 25, 2007, he was helping his brother, Kenny Lane, move furniture. The appellant said Kenny Lane had been drinking "pretty hard" and was "highly intoxicated." They needed rope to tie down the furniture in the back of a truck, so they went to borrow some rope from Mark Hill. When they arrived at Hill's residence, Woody answered the door. They went inside and saw the victim. The appellant said the victim appeared "like he had a buzz or was high a little bit." The appellant inquired about Hill and learned that Hill was in jail. The appellant asked the victim for rope, but the victim did not have any.

The appellant said that he and his brother stayed at the residence, talking with the

victim while Woody went into the kitchen. The appellant said:

> Kenny starts messing with him about something about he had
> heard that he had stole some stuff out of a car that he owned,
> and one thing led to another, and I said, well, you know it wasn't
> – I didn't steal nothing from you, got into an argument about
> that. That's when Kenny said, well, he said, we might just beat
> the shit out of you, and I said, well, I said, you know I'll kick
> your ass for lying on me like that. I said you know I didn't steal
> nothing, and that's when . . . [the victim] said, well, I'll just beat
> the shit out of you or shoot you one, and that's when he showed
> me a pistol.

The appellant said he backed up and told the victim "let's don't go there." As the victim stood, he "brushed" the appellant, and the appellant pushed him away. The appellant said he heard a click, like a round being chambered in a gun. The appellant backed away and told the victim not to pull a gun on him. The appellant showed the victim his Derringer. The appellant stated that the victim turned, and he again heard a click. Kenny Lane yelled, "He's got a gun, he's going to shoot us and kill us all." The appellant then fired his weapon.

The appellant stated that after the shot, the victim did not fall. The appellant said, "He was still messing with the gun and he stepped into the bedroom and he shut the door." When Woody came into the living room, the appellant told her that the victim "had caused [the appellant] to shoot him and for her to call 911 and the police."

The appellant said that after the shooting, he and Kenny Lane left the residence. The appellant was "in shock." Kenny Lane purchased beer, and they drove around for a while. The appellant said he thought "what in the world am I going to do . . . because I had shot this guy that I had knew." The appellant then went to his mother's house in Morristown, where he was arrested later that night.

The appellant said he did not intend to kill the victim and was acting in self-defense. He said that if he had intended to kill the victim, he could have fired a second shot from his Derringer. The appellant said that he knew the victim was a "rough-houser" and that he had previously been violent toward other people. The appellant stated that the victim had previously stabbed Donnie Baker and had hit Baker in the head with an axe. The appellant said the victim had stabbed Tim Glutch and had pulled a gun on Greg Dalton.

On cross-examination, the appellant said that he thought Hill lived at the residence and that he did not know Hill was in jail. The appellant said that his girlfriend was Sue

Jarnigan and that about six weeks before the incident, he briefly saw the victim at Jarnigan's residence. He stated that he did not know the victim took OxyContin and morphine. The appellant acknowledged that he knew the victim "ran dope" but denied that he went to the victim's residence to buy drugs. He said that when he was talking to the victim, he said, "I'll kick your whatever for lying on me." The appellant maintained, "I had heard that he had thought that I had broke into a vehicle of his." The appellant said that when they talked, they began arguing, and "it . . . all got out of hand."

Greg Dalton testified that approximately twelve years earlier, when he was nineteen years old, he and the victim had been playing cards and arm wrestling. After Dalton beat the victim arm wrestling, the victim pulled out a gun, laid it on the table, and said, "I've got something for you, big boy, if you think you're bad I've got something for you right here." The people with them made the victim put up the gun and leave.

Timothy Glutch testified that he was serving time in prison for aiding and abetting an armed robbery. Glutch said that in April 2001, the victim came to his residence. Glutch got in the victim's vehicle, and the victim asked if Glutch would sell him drugs. When Glutch said no, the victim stabbed Glutch twice in the leg with a knife. The victim left after Glutch ran inside his house.

Michael Inman testified that he had previously been convicted of aggravated robbery, kidnapping, and aiding and abetting a burglary. Inman said that in 2000, he and his brother drove past a house that had burned. Inman's brother yelled out the window at the people standing around the house that he hoped they got insurance money for the burned house. Inman and his brother kept driving down the road and later saw that a truck, with two men in the front and one in the back, was chasing them. The vehicles stopped, and the three men got out of the truck. The victim, who had been in the passenger seat, had a gun in his hand. The victim "cuss[ed]" Inman and his brother. Inman told the victim that he was being cowardly. The victim threw his gun in the truck. He approached Inman's brother, grabbed him by the throat, threw him against Inman's vehicle, and there was a scuffle. Afterward, Inman and his brother went to a cousin's house. The victim later went to Inman's mother's house, trying to find Inman and his brother.

Margaret Massengale, who worked in the TBI crime laboratory's toxicology unit, testified that the victim tested positive for methamphetamine at a level that was much higher than a "therapeutic level." Massengale said that methamphetamine was a stimulant which could possibly cause excitement, agitation, and/or euphoria. The victim also tested positive for methadone, but those levels were consistent with a therapeutic dosage. The toxicology results revealed the presence of other substances, such as atropine and midazolam, which are commonly used by medical personnel during treatment in emergency situations.

At the conclusion of the proof, the jury found the appellant guilty of first degree murder and conspiracy to commit first degree murder. The appellant received concurrent sentences of life and twenty years, respectively. On appeal, the appellant challenges the sufficiency of the evidence underlying his convictions.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In order to obtain the appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is

indicative of premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

The appellant contends that "repeated blows or shots may support an inference of premeditation. . . . Therefore[,] it follows that the lack of repeated shots is circumstantial evidence that would tend to disprove premeditation or even an intent to kill." The appellant insists that the shooting occurred "during a dispute" and that he therefore "did not possess the 'cool mental state' required to establish deliberation." Moreover, he argues that his leaving Woody and the victim alive indicates that he had no intent to kill or to hide his crime. He points out that neither he nor Kenny Lane had the money or means to flee after the shooting and that "if the [appellant] had deliberated on the consequences of his action to the level which would satisfy premeditation he would not have committed the killing without some plans for escape." Further, he argues that he sufficiently proved self-defense and that the jury erred in rejecting his defense. He maintains that without an intent to commit murder, "there can be no conspiracy to commit murder either."

Much of the appellant's argument centers around the appellant's lack of deliberation. First degree murder was previously defined as the "intentional, premeditated and deliberate killing of another." See Tenn. Code Ann. § 39-13-202(a)(1) (1991). However, the statute under which the appellant was charged no longer requires the element of deliberation, providing that first degree murder is the "premeditated and intentional killing of another." See Tenn. Code Ann. § 39-13-202(a)(1) (2006). Therefore, the appellant's arguments that the proof against him failed to establish deliberation are unavailing.

In the light most favorable to the State, the proof adduced at trial reflects that the appellant and his brother, Kenny Lane, went to the victim's residence. They confronted the victim about spreading rumors regarding the appellant stealing from the victim's vehicle. Woody saw the appellant pull a small Derringer from his jacket and heard him tell the victim, "You will never talk about me again." Then, the appellant fired the gun. The bullet struck the victim in the back, passed through his body, and exited his chest. Woody said the victim was unarmed. Kenny Lane ordered Woody to stay where she was and to be quiet. When the appellant and Kenny Lane were leaving, the appellant told Woody that she could check to see whether the victim was dead. We conclude that the foregoing evidence, indicating that the appellant sought revenge for a rumor about his thievery and shot the unarmed victim in the back, sufficiently establishes that the appellant committed premeditated first degree murder.

The appellant also contends that the State failed to prove beyond a reasonable doubt that he did not act in self-defense, maintaining that his use of deadly force was justified. See Tenn. Code Ann. § 39-11-611. Generally, if evidence is introduced supporting self-defense, the burden is on the State to prove beyond a reasonable doubt that the appellant did not act

in self-defense. See Tenn. Code Ann. § 39-11-201(a)(3). However, whether an appellant acted in self-defense is a factual determination to be made by the jury. State v. Goode, 956 S.W.2d 521, 522 (Tenn. Crim. App. 1997). Although the trial court properly charged self-defense to the jury, the jury clearly rejected this defense. Again, we note that Woody testified that the unarmed victim was in ill-health, wore braces on his feet, and had difficulty walking. Further, the proof reflected that the appellant shot the victim in the back. From this evidence, we conclude that the jury had ample evidence from which it could conclude that the appellant did not act in self-defense.

Regarding the conspiracy conviction, our code provides that "[t]he offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." Tenn. Code Ann. § 39-12-103(a). In the light most favorable to the State, the evidence reflects that the appellant, who was armed with a gun, and Kenny Lane went to the victim's residence to confront the victim about rumors that either the appellant or Kenny Lane had stolen from him. During an argument, the appellant shot the victim. Kenny Lane ordered Woody not to interfere. The men left together, driving around and obtaining beer before going to their mother's house.

Our supreme court has explained that " the essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act." Pike, 978 S.W.2d at 915. Further, it is well-established that "the agreement need not be formal or expressed, and it may be proven by circumstantial evidence . . . 'and the conduct of the parties in the execution of the criminal enterprise.'" Pike, 978 S.W.2d at 915 (quoting Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978)). In the instant case, there was no evidence adduced to suggest there was an agreement between the two men to kill the victim. Simply because Kenny Lane was present with the appellant, told Woody to be quiet and not interfere after the shooting, and left with the appellant is not sufficient to support a finding of conspiracy. "Mere knowledge, acquiescence, or approval of the act, without cooperation or agreement to cooperate, is not enough to constitute one a party to a conspiracy. There must be intentional participation in the transaction with a view to the furtherance of the common design and purpose." Solomon v. State, 76 S.W.2d 331, 334 (Tenn. 1934). Given the paucity of evidence to support the appellant's conviction for conspiring with Kenny Lane to commit first degree murder, we conclude that we must reverse this conviction.

### III. Conclusion

In sum, we conclude that the State sufficiently established that the appellant killed the victim with premeditation and that he did not act in self-defense. Therefore, we affirm that

conviction. However, we conclude that there was insufficient evidence to sustain his conviction for conspiracy to commit murder. Therefore, we reverse this conviction and the charge of conspiracy to commit first degree murder is dismissed.

_____
NORMA McGEE OGLE, JUDGE